## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**JOHNNIE L. JONES,**

      **Plaintiff,**

**vs.**                                                    **CIVIL ACTION NO. 2:20-CV-00437**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered June 30, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings, Brief in Support of Judgment on the Pleadings, and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 13, 14, 15)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 13); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 15); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Johnnie L. Jones, (hereinafter referred to as "Claimant"), protectively filed his application for benefits on or about July 31, 2017, alleging disability since December 20, 2015 due to osteoarthritis in all joints, depression, anxiety, bipolar disorder, hypomania, fibromyalgia, mitral valve prolapse, a "learning disability/ADHD", hypertension, hyperlipidemia, chronic low back pain, insomnia, a "spot on lung, gerd." (Tr. at 10, 175-178, 206-207) His claim was initially denied on October 30, 2017 (Tr. at 101-111) and again upon reconsideration on January 18, 2018 (Tr. at 113-119). Thereafter, Claimant filed a written request for hearing on February 15, 2018 (Tr. at 120-121).

An initial administrative hearing was held on April 4, 2019 before the Honorable Francine A. Serafin, Administrative Law Judge ("ALJ") (Tr. at 32-67). On May 15, 2019, the ALJ entered an unfavorable decision. (Tr. at 7-26) On June 3, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 173-174) The ALJ's decision became the final decision of the Commissioner on April 23, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On June 26, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and a Brief in Support of Judgment on the Pleadings (ECF Nos. 13, 14), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 15). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 46 years old as of the alleged onset date, thus determined to be a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 29) Claimant has a high school education and received additional training as a truck driver. (Tr. at 225) Claimant last worked as a truck driver, but his duties included loading and unloading rail equipment. (Tr. at 62-63) He stopped working after he suffered a stroke on April 30, 2017. (Tr. at 48)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant filing for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). That Section provides as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

4

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant meets the requirements for insured worker status through December 31, 2019. (Tr. at 12, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since December 20, 2015, the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: osteoarthritis; fibromyalgia; low back pain; bipolar disorder; anxiety disorder; depression; and somatic symptom disorder. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 13, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work

> He can occasionally climb ladder, ropes, and scaffolds, and can frequently climb ramps and stairs. The claimant can frequently balance, stoop, kneel, crouch, and crawl. He must avoid frequent exposure to extreme humidity, vibration, and workplace hazards such as moving machinery and unprotected heights. The claimant can tolerate no more than occasional exposure to crowds. He is capable of tolerating a few changes in the work environment, which I define as three-to-four changes per workday or work shift.

 (Tr. at 16, Finding No. 5)

6

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 19, Finding No. 6) At the final step, the ALJ determined that in addition to the immateriality of transferability of job skills, Claimant's age, education, work experience and RFC, there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Tr. at 20, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from December 20, 2015 through the date of the decision. (Tr. at 21, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant asserts that the ALJ failed in her duty to fully develop the medical evidence regarding Claimant's numerous physical and mental impairments and emphasizes his testimony is corroborated by the medical records provided by his treating physicians. (ECF No. 14 at 15-17) In short, Claimant contends that the ALJ "completely ignored" this evidence. (Id.) Claimant also contends that the ALJ failed to properly consider and evaluate the medical evidence in combination, which meet or exceed Listings. (Id. at 17-18) Claimant states the medical evidence from multiple treating physicians is uncontradicted and the combined effect of his impairments preclude any substantial gainful activity; instead of considering the records from Claimant's longtime treating providers, she substituted her own opinion. (Id.) Claimant asks this Court to reverse the final decision to award benefits or alternatively, to remand for further proceedings. (Id. at 19)

In response, the Commissioner asserts that Claimant failed to meet his burden of proof that he was disabled, and that the ALJ satisfied her duty to develop the evidence to assess the appropriate RFC based upon all the relevant evidence. (ECF No. 15 at 9-12, 15-16) Additionally, the Commissioner states that the ALJ alone makes an RFC finding and is not required to be based

upon a specific medical opinion; the ALJ did not ignore Claimant's treating physicians' opinions, but properly evaluated same under the pertinent Regulations. (Id. at 12-15) The Commissioner further argues that Claimant fails to not only identify any specific Listing the combination of his impairments supposedly met, but also fails to identify any specific evidence in support of his generalized argument for same. (Id. at 17) The Commissioner points out that at step three, the ALJ did consider Claimant's impairments under the pertinent Listings, as well as the combined effects of his impairments, and proceeded to consider them in the subsequent steps in her analysis. (Id. at 18-19) Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 20)

**The Relevant Evidence of Record**[1]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Mental Health Treatment During Relevant Period:

Psychiatrist Lawrence Kelly, M.D., provided treatment to Claimant during the relevant period (Tr. at 378-419, 579-583, 610). Dr. Kelly diagnosed bipolar disorder, (Tr. at 389, 401-404, 406-409, 413, 610), and prescribed Xanax (Tr. at 650). In July 2016, Dr. Kelly noted Claimant had a history of dyslexia and attention deficit disorder and reported Claimant exhibited normal thought content and a good general fund of information and had no deficits in immediate or short-term recall (Tr. at 387, 389, 411). In August 2016, Claimant reported restless leg syndrome interfered with his sleep; he was diagnosed with bipolar disorder II; hypomanic, restless leg syndrome; and

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

chronic pain from arthritis and fibromyalgia per Dr. Harris. (Tr. at 385)

Claimant reported in September 2016 that Dr. Harris diagnosed depression and had prescribed medication, but he did not fill the prescription (Tr. at 384). In November 2016, Claimant reported that he could not work as he once did due to pain, and he was losing money; he stated that nobody could do the jobs as he did, and he might file for bankruptcy (Tr. at 383). Claimant also indicated that he wanted to file for disability benefits (Id.). He also reported that he was taking Lamictal most nights and that it helped to calm him, but it caused him to feel like a "walnut sized area in his brain" but the sensation is gone by morning; he did not want to increase the dosage (Id.).

On December 7, 2016, Claimant told Dr. Kelly that he cannot maintain his work and that Dr. Harris initially disabled him due to arthritis. (Tr. at 382) By December 14, 2016, Claimant told Dr. Kelly in a phone call that he could not perform his job duties without the benefit of opiate medication needed for his osteoarthritis pain (Tr. at 381). Opiates prevented Claimant from driving commercially, and he reported having compromised coordination at times, which placed him in danger at the job site (Id.). Dr. Kelly noted that Claimant was hypomanic which may affect his judgment; at times he becomes enraged and must leave work and isolate himself for several days or a week, and occurring "2-4x usually for a few days." (Id.) In a letter written that day, Dr. Kelly opined that Claimant was "totally unable to perform his work duties due to the disabilities arising from his psychiatric and physical conditions" (Tr. at 399). He indicated that Claimant usually was hypomanic and several times monthly may experience anger and impulsivity (Id.). Dr. Kelly stated that due to the anger, Claimant would remove himself from the work site for one to seven days, until he was calm enough to return (Id.). Dr. Kelly also referenced notes from Dr. Harris from July

22, 2011 stating that it was recommended that Claimant quit work and was disabled due to fibromyalgia (Tr. at 400); Dr. Kelly referenced a note from Dr. Harris dated September 14, 2015 stating that Claimant could not be declared disabled because he could work up to the point of pain (Tr. at 399).

Dr. Kelly's January 6, 2017, treatment note indicated Claimant experienced no anger episodes and had been staying at his farm (Tr. at 380). Claimant reported Lortab helped his pain and mood (Id.). Claimant had not been working in the past month and stated he was feeling better and wanting to go to Brazil, possibly in a couple of weeks (Id.). In February 2017, Claimant reported he had been at his farm caring for his herd of goats and since being at his farm and not working, his mood is "good & stable"; he described calmness when not in a structured environment and he does not have to specific times to be accountable to, though he endorsed feeling agitated and angry and will "blow up" (Tr. at 379, 403). Claimant admitted his back pain is problematic if he exerts himself. (Id.) Dr. Kelly reported Claimant had good eye contact, a broad affect, good memory and judgment, and no evidence of cognitive or intellectual deficits (Id.).

On May 30, 2017, Claimant complained of decreased sleep and falling asleep while driving. (Tr. at 378)

On August 16, 2017, Claimant told Dr. Kelly he had been in Florida for two weeks after his neighbor stole $30,000.00 worth of equipment from him (Tr. at 582). Claimant left because he was extremely angry and feared losing control (Id.). On August 28, 2017, Dr. Kelly completed a mental residual functional capacity assessment form and noted Claimant's diagnoses as bipolar II, hypomania, depression, and anxiety. (Tr. at 580) While Dr. Kelly indicted that Claimant had no significant limitations in any area of understanding and memory, he indicated Claimant was

"markedly limited" in the following areas:

> the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to set realistic goals or make plans independently of others.

(Tr. at 580-581) Dr. Kelly also indicated that Claimant was "moderately limited" in his ability to respond appropriately to changes in the work setting. (Tr. at 581) Dr. Kelly opined that Claimant would be absent from work more than four days per month and that based on his review of Claimant's "medicals for disability", he had been disabled since December 2015. (Id.)

In December 2017, Claimant reported anxiety due to the theft, but also that he had not experienced any explosive episodes since taking Xanax (Tr. at 610). He indicated he felt unsafe at his farm and went there only to feed and care for his cattle (Id.). He reported taking trips to Missouri, Georgia, Mississippi, and Florida because anxiety makes him want to leave home (Id.). Claimant also reported that he purchased equipment and a truck on these trips but did not need them and they were in a storage building (Id.). He also reported plans to travel to Disney World and Brazil (Id.).

Psychological Evaluation Report:

Consultative psychological examiner Lester Sargent, M.A., diagnosed bipolar disorder and somatic pain disorder following an October 2017 evaluation (Tr. at 584-589). A mental status examination revealed Claimant exhibited a cooperative attitude, a euthymic mood and reactive

affect, mildly paranoid ideation but no delusions or compulsive behaviors, moderately impaired judgment based on his responses to comprehension questions, fair insight based on his responses to questions regarding social awareness, intact immediate memory, moderately impaired recent memory, and poor remote memory, intact concentration, moderately impaired persistence based on his ability to remain focused on task, and a rapid pace as evidenced during the evaluation (Tr. at 586).

Claimant stated that he applied for DIB because he had not worked in years, and had osteoarthritis, fibromyalgia, mitral valve prolapse, bipolar disorder, and constant pain (Tr. at 584). He stated he "had investments in oil wells, property and houses," his son ran his company, and his accountant paid his bills (Tr. at 585). He reported he received vocational training in welding and as an electrician, and had operated equipment at work including hand and power tools, cranes, and bulldozers (Tr. at 586). He also denied having any problems obtaining a driver's license (Tr. at 586). He reported his biggest problem was dealing with people, got angry "real quick," was impulsive, got manic, and had been suicidal before receiving medications to help (Tr. at 584-585). Mr. Sargent reported that pain was a focus of clinical attention during the evaluation; Claimant reported constant pain and being very frustrated by his pain levels and resulting functional limitations (Tr. at 586).

Claimant reported initially receiving mental health treatment in 2012 from Dr. Harris for depression and mania symptoms, receiving psychiatric treatment from Dr. Kelly since 2015, and never undergoing hospitalization for mental health issues (Tr. at 585). Mr. Sargent explained that the bipolar diagnosis was based on Claimant's "reported history of experiencing episodes of major depression, mania, and hypomania," while the somatic pain disorder was based on both

psychological factors and his general medical condition contributing to the onset, severity, and exacerbation of his pain complaints (Tr. at 587). Per Claimant's report, Mr. Sargent indicated Claimant may require assistance managing his funds should an award be made. (Id.)

Treatment for Physical Impairments During Relevant Period:

Claimant's family practitioner, William Harris, M.D., provided treatment before and during the relevant period for osteoarthritis in his ankles, knees, hands, shoulders, neck, and back (Tr. 363-377, 420-578, 590-606, 611-648). Dr. Harris' treatment notes also document Claimant's multiple trigger points of pain/tender points and diagnoses of fibromyalgia beginning in 2011 (Tr. at 400, 466, 469, 472, 593, 618). On July 22, 2011, Dr. Harris noted that Claimant "has wear and tear overuse traumatic fibromyalgia related to excessive work" and he recommended that Claimant quit work and that Claimant was disabled due to fibromyalgia. (Tr. at 400) On August 14, 2013, Dr. Harris again recommended Claimant quit work due to fibrositis and pain; Dr. Harris recommended Claimant avoid heavy lifting and the type of work he was doing on his farm (Tr. at 470). Dr. Harris also completed a disability form indicating Claimant's disability began July 22, 2011 to an unknown period of time. (Tr. at 628-629)

Dr. Harris prescribed pain medications including the opiate drug hydrocodone bitartrate/acetaminophen, clonidine, Flexeril, ibuprofen 800mg, and Norco (Tr. at 410, 642). He instructed Claimant not to drive while taking controlled drugs (Tr. at 642). Claimant indicated in August 2017 that his attorneys called him and told him he needed to start Meloxicam for his osteoarthritis, but Dr. Harris disagreed, explaining that the ibuprofen 800mg was more effective (Tr. at 424). At the start of the relevant period, in December 2015, Claimant reported his medication lowered his level of pain from 10 out of 10 to 4 out of 10 (Tr. at 542). Thereafter,

Claimant reported his medications lowered his pain level from 9 or 7 to 2 out of 10, and improved his quality of life and ability to perform activities of daily living (Tr. at 425-431, 433-437, 439-443, 445-449, 471, 591-592, 594-595, 612, 614, 617, 619, 646).

Dr. Harris' physical examinations typically revealed Claimant exhibited painful range of motion in back, legs, hands, and shoulders, as well as normal findings related to his motor, sensory, and coordination modalities (Tr. at 425-448, 464, 518-529, 531-541, 591-592, 595, 612-616, 618, 642, 646). Dr. Harris' records also document Claimant's reports of extensive physical activities including working on his farm regularly and riding a mechanical bull (Tr. at 444, 531). In March 2016, Claimant complained of neck pain "after working on lights" (Tr. at 444, 537), and in September 2016, he pulled his abdominal muscles after riding a mechanical bull and Dr. Harris noted Claimant "Does not exercise but is very active - has a farm" (Tr. at 531).

December 2015 records also showed Claimant developed a locked left trigger finger, and Dr. Harris referred him to an orthopedist, Scott Ciaccia, D.O., and Jacquelin Mollohan, APRN, FNP-C, of CPG Orthopedic Trauma Group (Tr. at 548). Dr. Ciaccia and Nurse Mollohan provided treatment for Claimant's complaints of left trigger finger pain from January through June of 2016 (Tr. at 363-377). Claimant denied numbness, tingling, or injury (Tr. at 374). Dr. Ciaccia administered steroid injections in January, February, and April of 2016, and recommended range of motion exercises and avoidance of repetitive pinch and grip (Tr. at 370-371, 374). Claimant reported the injections worked great and he had only a few instances of finger locking (Tr. at 367). During his final visit in June 2016, Claimant declined further injections (Tr. at 364). Nurse Mollohan advised Claimant to return if he needed another injection for a locked digit, (Id.), but there is no evidence that she or Dr. Ciaccia provided additional treatment.

Claimant reported injuring his right shoulder in October 2018 (Tr. at 644). That same month, a right shoulder MRI confirmed a tear of the supraspinatus tendon without retraction (Id.).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he started his business as an owner/operator of an HVAC[2] construction company at 24 years old and has had the same secretary do all the paperwork involved in the business. (Tr. at 37-39, 43) He stated that he could not read or write when he got out of high school and had the secretary take care of contracts for the business and an accounting firm do the payroll. (Tr. at 39, 40) He did not interact much with the customers because of arguments. (Tr. at 43)

Claimant testified that he gave up his business to his son because the pain and painkillers caused him to wreck vehicles and he was "just basically hating the human race." (Tr. at 44) His feet also hurt him so bad he wouldn't sleep, sometimes up to five days, and he would pass out driving. (Id.) He also stated he started having a hard time holding a glass and he dropped them and couldn't figure out why; he went to the doctor and was told to quit. (Tr. at 44-45)

Claimant testified that he has pain and discomfort in his low back, knees, joints, and both feet, the right more than the left, that has persisted for longer than five years. (Tr. at 45-46) He has problems with walking and sitting but when he gets into the hot tub, the first two to three minutes feels "like a vacation"; he uses the hot tub a lot to help with his pain (Tr. at 46, 48-49) He has used a cane for about two to three years to help with stability because he can fall. (Tr. at 46) He also

---

[2] "HVAC": Heating, Ventilation, and Air Conditioning.

tried low impact exercise on the advice of his doctor, but quit because it hurt his feet and knees, though he tries to stay moving. (Tr. at 49) He uses a heating pad on his bed and keeps his house at 80 degrees; he also used a TENS unit but it did not work as much as he thought it would. (Tr. at 49-50) He indicted that he wore a copper bracelet that seems to help with his pain. (Tr. at 52)

Claimant testified that Lortab helps him sit still and they calm his nerves; he said he is "dangerously moody" without it. (Tr. at 47) Without his pain medication, he is constantly moving and will "waller" around. (Id.) Physical activity increases the pain in his back. (Tr. at 48) He indicated that the pain medication has caused his teeth to fall out and he has problems sleeping at night. (Tr. at 50-51) Cold weather also affects his pain. (Tr. at 52)

With regard to his mental impairments, Claimant stated his depression was caused by his constant pain because he is limited in doing things; he endorsed crying spells and getting "real mad" because of his pain. (Tr. at 54) His depression has affected many areas, including appetite, sex, play, fishing, sleep, "everything." (Id.) He gets mad easily and cannot concentrate; he lost interest in activities he used to enjoy. (Tr. at 55) It has also affected his ability to interact with others. (Tr. at 56)

Vocational Expert ("VE") Testimony:

After listening to Claimant's testimony, the VE determined that Claimant's past work in HVAC installation and service provider is classified as medium and skilled, but overall, the exertion of the work would be heavy; as a self-employed individual, Claimant's past work as a small business owner would be classified as light. (Tr. at 60-61) After having considered several hypothetical questions posed by the ALJ with regard to an individual with Claimant's functional profile (Tr. at 61-63), the VE testified that an individual of Claimant's age, education, and

vocational background who had Claimant's limitations as described in the RFC, *supra*, would be able to perform medium unskilled jobs that exist in significant numbers in the national economy, in areas such as a vehicle equipment cleaner, a janitorial and cleaning job, such as a night cleaner, or a busser or dining room attendant (Tr. at 63). The VE further stated that if the individual were to be off task for 15% of the workday, then there would be no work available. (Tr. at 63-64) The VE testified that if an individual is markedly limited in his ability to maintain attention and pace, to remember and stay on task, to accept and work in and adapt to changing environments, and to complete a normal workday, where he would be off task 20 or 25 percent of the time, then the individual would be precluded from the jobs identified. (Tr. at 64-65) The VE also testified that if the individual was unable to stand more than 10 to 15 minutes, sit for more than 30 minutes without the need to frequently change positions, standing and sitting, and lifting less than 8 pounds, the individual would also be precluded from the jobs identified. (Tr. at 65)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As noted *supra*, Claimant argues that the ALJ failed in her duty to develop the record with respect to several alleged impairments[3], and that she "completely ignored" his testimony and the medical documentation concerning the limitations his impairments caused. (ECF No 14 at 15-17) As an initial matter, with respect to Claimant's contention that the ALJ "completely ignored" his testimony, the undersigned **FINDS** this argument lacks merit:

Early in the written decision, the ALJ specifically recalls Claimant's testimony concerning his alleged learning disability, ADHD and inability to read or write upon graduation from high school (Tr. at 13). She also recognized that he started his own heating and air conditioning business at the age of 24 that he operated successfully for many years (<u>Id</u>.). She also acknowledged his testimony that his secretary and accountant provided most of the paperwork for his business and that he held government contracts. (Tr. at 14) The ALJ also mentioned that she observed no "concentration deficits" during the hearing. (Tr. at 15) During her assessment of Claimant' RFC,

---

[3] Claimant has specified the following impairments, including but not limited to: osteoarthritis in all joints including feet, legs, knees, shoulders and back; right trigger finger; torn ligament in right ankle; complete tear of rotator cuff; depression; anxiety; bipolar; "ed"; learning disabilities and ADHD; hypertension; hyperlipidemia; chronic low back pain; insomnia; GERD; restless leg syndrome; and hearing loss. (ECF No. 14 at 15)

she again noted his testimony about running his own heating and cooling business, that his secretary and accountant handled most of the paperwork for same, though he did do some paperwork in addition to the filed work. (Tr. at 16) She noted his testimony concerning his loss of grip, foot pain that kept him awake at night, and that the combination of fatigue, pain and pain medication caused him to wreck multiple vehicles and that he stopped working in 2015 on the advice of his physician. (Id.) She further noted his allegations of low back pain, pain in both knees, both hands, and right foot as the result of degenerative disc disease and osteoarthritis. (Tr. at 16-17) She acknowledged he experienced pain when sitting, standing, and walking and to using a cane for stability over the past two and half years. (Tr. at 17) She noted he used pain medication, a TENS unit, and a hot tub to alleviate his pain, though it never fully dissipates. (Id.) She noted his experiencing sleep difficulties, problems with concentration due to pain and that his pain contributed to his feelings of depression. (Id.) She acknowledged his described psychological symptoms of irritability, problems with understanding and memory, a lack of interest in activities, distractibility, flight of ideas, anhedonia, and generally feeling "down." (Id.)

The Duty to Develop the Evidence:

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's

19

arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process. Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W.Va. Jan. 4, 2011) (Eifert, M.J.) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require her to make specific inquiries into Claimant's

treatment modalities or search for cumulative evidence; her duty is to obtain sufficient evidence upon which she can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

With respect to Claimant's assertion that the ALJ failed to develop the evidence with regard to his numerous physical and mental impairments (See footnote 2, *supra*), it is noted that Claimant neither specifies what evidence was not adequately fleshed out by the ALJ, nor what evidence specifically supports his argument that he is disabled. For starters, it is important to recognize that this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)); see also Call v. Berryhill, Civil Action No.2:17- CV-02292, 2018 WL 4659342, *4 (S.D.W. Va. Sept. 28, 2018). While the ALJ may not have specifically mentioned each of Claimant's alleged impairments[4], she stated that she considered all the evidence of record. (See Tr. at 10 ("After careful consideration of all the evidence. . ."); Tr. at 12, 16 ("After careful consideration of the entire record. . ."; and Tr. at 17 ("After careful consideration of the evidence . . ."). Having so stated, this court should "take

---

[4] The ALJ did not expressly mention the torn ligament in his right ankle, hypomania, GERD, restless leg syndrome and hearing loss, as mentioned *supra*, and Claimant does not explain how each of these impairments, let alone in combination, disabled him. In any event, the ALJ does discuss how Claimant's impairments and symptoms related thereto affected his overall functioning in her review of the medical and other evidence of record in her assessment of his RFC (Tr. at 16-19).

her at her word." <u>Reid</u>, 769 F.3d at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); <u>see also</u> <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."); <u>Christina W. v. Saul</u>, No. 4:19-cv-00028-PK, 2019 WL 6344269, *4 (D. Utah Nov. 27, 2019)("Plaintiff further argues that the ALJ erred in not explicitly discussing various pieces of evidence, particularly the fact that she is participating in a structured treatment program. While the ALJ must consider all the evidence, she need not recite each piece of evidence she has considered. The ALJ stated that she carefully considered the entire record and the Court can take her at her word."). Moreover, despite Claimant's listing the various diagnoses and symptoms related thereto in his brief, this is not the litmus test for disability, as it is also well known that diagnoses alone do not establish disability, because there must be a showing of related functional loss. See <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted).

Nevertheless, despite Claimant's assertion otherwise, the ALJ expressly considered not only the medical evidence, and in particular that evidence provided by his treating providers (See, e.g., Tr. at 15, 17-19), including medical evidence that predated his alleged onset date (Tr. at 17, 423-516, 517-578)[5], but also other evidence of record, which included Claimant's educational records documenting his placement under an individualized education plan, though it did not show a diagnosis for ADHD (Tr. at 13, 313-362). In addition to the opinion evidence (Tr. at 15, 19),

_____

[5] The ALJ expressly mentioned the medical record as it pertained to Claimant's fibromyalgia, noting he had been diagnosed with the condition "as early as 2013" (Tr. at 17).

which included the opinions provided by state agency consultative examiners, state agency consultants, as well as Claimant's own treating physician and psychiatrist, the ALJ also expressly considered Claimant's and the vocational expert's testimonies (Tr. at 13, 14, 15, 16-17, 20-21) Indeed, when asked by the ALJ at the beginning of the hearing if there was a complete record in this case, Claimant's attorney responded in the affirmative. (Tr. at 36) In short, Claimant has failed to demonstrate any paucity in the evidence that would have warranted further development of the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

Consideration of the Combined Effect of Impairments:

In a conclusory fashion, Claimant asserts that the medical evidence confirms that the combined effect of his severe physical and mental impairments rendered him totally disabled and meet or exceed Listing requirements. (ECF No. 14 at 18) Claimant does not specify which impairment specifically meets or equals any Listing, he again emphasizes that the ALJ failed to consider the medical evidence from his treating physicians. (Id.)

The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful

activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531.  A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found numerous impairments that were not severe enough to have significantly limited Claimant's ability to perform basic work activities: hypertension; hyperlipidemia; and his right shoulder labral tear. (Tr. at 12-13) The ALJ specifically noted that Claimant received no medication for hyperlipidemia and "until 2019, records indicate that his hypertension was controlled by diet alone"; though Claimant was prescribed Clonidine for his hypertension, a treatment note dated February 2019 indicated the condition was "labile in nature" and he only needed to take his medication as needed (Tr. at 12, 423-516, 517-578, 590-606, 611-626, 641-642) With regard to Claimant's full tear of the supraspinatus tendon in his right shoulder, the ALJ noted that Claimant

24

testified is was "pretty bad" for approximately three weeks and that he underwent some physical therapy, and now uses exercise bands at home (Tr. at 13, 643-644). The ALJ found that none of these impairments existed for a continuous period of twelve months, were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations. (Tr. at 13)

With respect to Claimant's alleged learning disability and ADHD, the ALJ noted he advised Mr. Sargent during the psychological evaluation that he received special education services, was never retained in any grade, and that he received vocational training in welding and as an electrician. (Tr. at 13, 584-589) The ALJ observed that the educational records confirmed Claimant's individualized education plan, failed to document a diagnosis of ADHD, and showed that Claimant primarily earned As and Bs during his senior year of high school. (Tr. at 13, 313-362) The ALJ noted that while psychiatric records reflect a history of ADD, the ALJ determined that the diagnosis appeared to be based on Claimant's report, and that Claimant declined a prescription for ADHD medication. (Tr. at 13, 378-400, 401-419) Accordingly, the ALJ found that the record failed to establish ADHD or a learning disability as medically determinable mental impairments. (Tr. at 13)

Next, at the third step of the sequential evaluation process, the ALJ evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Id.) With regard to Claimant's osteoarthritis under Listing 1.02, which concerns major dysfunction of a joint, she noted that while the records show Claimant's range of motion was reported as painful, treatment notes also reflect that he had full range of motion in the extremities (Tr. at 13, 423-516, 517-578,

590-606, 611-626)[6], and psychiatric records reported a stable gait (Tr. at 13, 609-610)[7]. With regard Claimant's low back pain, under Listing 1.04, which concerns disorders of the spine, the ALJ observed there was no evidence of limitation of motion in Claimant's spine, no motor loss accompanied by sensory or reflex loss, or positive straight leg raising test; she noted that treatment records repeatedly indicated his reflexes were symmetrical, and that his motor, sensory, and coordination modalities were within normal limits (Tr. at 13-14, 423-516, 517-578, 590-606, 611-626, 641-642, 645-648)[8].

With regard to Claimant's fibromyalgia pursuant to Social Security Ruling (SSR) 12-2p, the ALJ acknowledged that while fibromyalgia is not a listed impairment, she determined that this impairment did not medically equal a Listing, such as 14.09 for inflammatory arthritis, or combine with other impairments to meet or equal a Listing, however, it was considered when rendering Claimant's RFC. (Tr. at 14)

With regard to Claimant's mental impairments, the ALJ considered the Listing requirements under Sections 120.04, 12.06, and 12.07 and determined that under the four broad areas of functioning, Claimant's impairments were not seriously limited. (Tr. at 14-16) Notably, in making her determination, the ALJ relied not only on the findings provided by state agency psychological consultant and examiner, Mr. Lester and Dr. Lilly, but also on the treatment records provided by Claimant's treating psychiatrist and physician, as well as Claimant's own testimony

---

[6] The ALJ referenced medical records from Dr. Harris, dated from October 23, 2012 to August 24, 2017, from July 29, 2015 to August 24, 2017, from September 22, 2017 to November 10, 2017, and September 22, 2017 to February 8, 2018.

[7] The ALJ cited treatment notes from Dr. Kelly dated November 14, 2017 to December 13, 2017.

[8] The ALJ again cited the medical records as listed in footnote 5, *supra*, plus additional treatment notes from Dr. Harris dated February 20, 2019 and October 10, 2018 to March 20, 2019.

and educational records. (Id.)

First, the ALJ determined Claimant had a mild limitation in understanding, remembering or applying information because his grades during his senior year in high school were no lower than a C (Tr. at 14, 313-362), plus, he advised Mr. Sargent that he was never retained in any grade and had obtained training in welding and electrical fields (Tr. at 14, 584-589). She further noted that Claimant's psychiatrist, Dr. Kelly, found that in 2016, Claimant's thought process was within normal limits, his general fund of information was good, and no deficits in immediate or short-term recall (Tr. at 14, 378-400, 401-419). The ALJ did, however, recognize that Mr. Sargent reported deficits in Claimant's judgment, insight, and memory (Tr. at 14, 584-589). The ALJ also referred to Claimant's testimony that while his secretary and accountant completed most of his business's paperwork, he completed some himself; he also testified that he worked in the field on a daily basis, held government contracts, and no one could perform the work as well as he did; he also stated at various times he invested in oil wells, property and houses. (Tr. at 14, 378-400, 401-419, 584-589)

In interacting with others, the ALJ found Claimant had a moderate limitation, relying on his report to Mr. Sargent that he experiences irritability, a quick temper, and being "angry at the world", but Mr. Sargent observed he was cooperative and had good eye contact during the interview. However, the ALJ recognized that Mr. Sargent found Claimant moderately impaired in social functioning, while Claimant reported going to the store on a monthly basis, he denied completing other errands, going out to eat or visiting family or friends – the ALJ also noted that Claimant denied having any close friends. The ALJ further noted that although Claimant reported to Mr. Sargent that he kept his medical appointments and sometimes went to the mall around

27

Christmas time, Dr. Kelly's records indicated Claimant tried to work in 2017, but he sometimes became frustrated and had to leave (Id).

In concentrating, persisting or maintaining pace, the ALJ found mild deficiencies, again relying on Mr. Sargent's observations that his concentration was intact, despite an impaired persistence and rapid pace during the evaluation; she also relied on her own observation during the hearing that Claimant exhibited no concentration deficits. (Tr. at 15, 584-589)

Finally, in adapting or managing himself, the ALJ found Claimant had moderate limitations, evidenced by Mr. Sargent's observation that he had fair insight, and capable of performing his activities of daily living with the exception of tying his shoes. (Id.) The ALJ also relied on Claimant's reported tendencies to demonstrate impulsive behavior, and that he had someone else manage his finances, as well as that he managed his own medication and kept his medical appointments; that he attempted to do all areas of housework, save sweeping or yard work; that he prepared meals, cared for his dog, and maintained his personal hygiene. (Id.) The ALJ also referred to Dr. Harris' treatment notes which indicated Claimant was "very active" and performed work on his farm. (Tr. at 15, 423-516, 517-578) The ALJ considered Dr. Kelly's treatment notes, which reported that Claimant spent most of his time on his farm, that he attempted to work, but he became frustrated, and when he recognized he was about to lose his temper, he would withdraw from the situation; she also noted that records from 2017 reported Claimant traveled to Georgia and Florida and planned to take a trip to Disney World and the Bahamas. (Tr. at 15, 378-400, 401-419, 579-583, 609-610)

In continuing her examination of the combination of effects resulting from Claimant's mental impairments under Listings 12.04, 12.06, or 12.15, the ALJ noted there was no evidence

supporting "paragraph C" criteria, further observing that Claimant had never required psychiatric hospitalization and that records indicated he responded well to psychotropic medication. (Tr. at 15, 584-589, 378-400, 401-419, 609-610) The ALJ evaluated the opinion evidence provided by state agency psychological consultants, Drs. Lilly and Hursey, who both found Claimant had mild limitations in the three areas of functioning, but moderate limitations in the area of interacting with others, *supra*. (Tr. at 15, 68-81, 83-97) While the ALJ found their opinions very persuasive, particularly with respect to the moderate limitations assessed in Claimant's social functioning because the record supported such a conclusion, the ALJ determined Claimant had moderate rather than mild limitations in the area of adapting and managing oneself because Mr. Sargent found Claimant's behavior impulsive. (Tr. at 15, 584-589)

Accordingly, the ALJ found Claimant's mental impairments did not meet Listing criteria.

To the extent that Claimant takes issue with the ALJ's evaluation of his subjective complaints, it is noted that recently the Fourth Circuit held that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id.

29

Another significant, if not critical, aspect of the <u>Arakas</u> holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. <u>Id</u>. Essentially, the Fourth Circuit has once again cautioned against an ALJ's analysis must not primarily rely upon the lack of objective medical evidence as the reason for discounting a claimant's complaints. As demonstrated by the foregoing, this did not occur here, as the ALJ herein did not select only those portions from the objective medical evidence that failed to support Claimant's allegations of disabling impairments, the ALJ also examined both aggravating and mitigating factors with respect to Claimant's subjective complaints which included his testimony, his reports to providers, the objective medical evidence, as well as the opinion evidence. The law does not require one to be pain-free of experience no discomfort in order to be found not disabled. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1458 (4th Cir. 1996). In this case, the ALJ provided a thorough and adequate analysis of Claimant's subjective complaints that complied with the pertinent Regulations and case law.

Clearly, the ALJ considered the medical evidence as well as Claimant's reported symptomology from the relevant time period. As discussed *supra*, the ALJ did consider this evidence in making her third step determination, thus, to the extent that Claimant argues that the ALJ failed to consider and evaluate the combined effects of his impairments, the undersigned **FINDS** this argument lacks merit. Additionally, to the extent that Claimant contends the ALJ failed to consider the medical records provided by his treating physicians, the undersigned **FINDS** this contention also lacks merit. Finally, to the extent that Claimant asserts the ALJ failed to consider his subjective complaints, the undersigned **FINDS** that the ALJ's subjective symptoms analysis complied with the pertinent Regulations and controlling case law and is based upon substantial

evidence. The undersigned further **FINDS** the ALJ's discussion of the objective and other evidence of record in her evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the evidence of record complied with the applicable law and is supported by substantial evidence.

<u>Evaluation of Opinion Evidence:</u>

Claimant fails to identify what opinion or opinions from his treating physicians the ALJ "substituted" with her own (ECF No. 14 at 18). Ostensibly because Claimant's treating psychiatrist, Dr. Kelly, opined he is totally disabled, whereas the ALJ determined Claimant was not, presumably this is the opinion she "substituted" with her own. Regardless, the ALJ appropriately recognized that pursuant to 20 C.F.R. § 404.1527(d), Dr. Kelly's opinion that Claimant was "totally unable to perform his work duties due to disabilities arising from psychiatric and physical conditions" was "inherently neither valuable nor persuasive as it deal with an issue reserved to the Commissioner[.]" (Tr. at 19) Moreover, the ALJ determined that this limited opinion was "inconsistent with reports of improved functioning subsequent to medication." (Tr. at 19, 378-400, 401-419, 609-610) In addition, to the extent that Claimant contends the ALJ did not adopt an RFC assessment endorsed by his treating physicians (which the record notably fails to demonstrate), it is also clear that the RFC assessment lies squarely with the ALJ, not with any medical provider/examiner. 20 C.F.R. § 404.1546(c); <u>see</u> <u>Felton-Miller v. Astrue</u>, 459 F. App'x 226, 230-31 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC.").

In any event, the ALJ explicitly applied the regulatory framework pursuant to Section

404.1520c to claims filed after March 27, 2017: "[a]s for medical opinion(s) and prior administrative medical finding(s), we will not defer or give any specific evidentiary weight, including controlling weight, to any administrative medical finding(s) or medical opinion(s), *including those from your medical sources*." (Tr. at 18) (emphasis added) In this case, the ALJ properly applied Section 404.1520c, which emphasizes the supportability and consistency factors when assessing the persuasiveness of the medical opinions of record. Instead of assigning weight to medical opinions, the ALJ now just considers the persuasiveness of a medical opinion (or a prior administrative medical finding). Id. 404.1520c(b)(2). Critically, the source of the opinion is not the most important factor in evaluating its persuasive value, instead, the most important factors are supportability and consistency. Id. When discussing her finding about whether an opinion is persuasive, the ALJ need only explain how she considered the "the most important factors" of supportability and consistency. Id. § 416.1520c(c). The ALJ "may" comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. Id. § 404.1520c(b)(2)-(3).

With regard to Dr. Kelly's opinion as articulated in the mental residual functional capacity assessment he completed on Claimant's behalf, *supra*, the ALJ found it "somewhat persuasive" (Tr. at 19, 579-583), specifically with regard to Dr. Kelly's determination that Claimant had no significant limitations in his understanding and memory, as it was consistent with the medical evidence; however, with regard to Dr. Kelly's determination that Claimant had marked limitations, the ALJ did not find these were supported by the record. The ALJ then listed some examples as to why she found these inconsistent with the record: despite Dr. Kelly's assigning marked limitations in Claimant's ability to travel to unfamiliar places, his records showed that Claimant made trips to

Florida, Georgia as well as Claimant's wishes for future trips (Tr. at 19, 378-400, 401-419, 579-583, 609-610), which included Brazil, Disney World and the Bahamas (Tr. at 18); despite Dr. Kelly's assigning marked limitations in Claimant's ability to accept instructions, respond to criticism, and get along with coworkers, Dr. Kelly's treatment records indicated that while Claimant reported irritability and anger issues, he indicated that he recognized when he was about to lose his temper and would withdraw from the situation (Tr. at 19, 378-400, 401-419); and despite Dr. Kelly's assigned marked limitations in the area of sustained concentration and persistence, testing revealed no marked limitations in this area – Claimant's concentration was found to be intact (Tr. at 19, 584-589).[9]

With regard to Dr. Harris' opinion, the ALJ acknowledged that he completed a statement indicating Claimant was unable to drive or run heavy equipment (Tr. at 19, 627-640), however, based on his treatment notes, the ALJ found this limitation was the result of pain medication as opposed to a physical impairment (Tr. at 19, 423-516, 517-578, 590-606, 611-626, 641-642, 645-648). Further, the ALJ noted that Dr. Harris did not provide any specific limitations arising from Claimant's complaints of pain; accordingly, the ALJ found this statement "unpersuasive." (Tr. at 19)

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that he is not disabled, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the

[9] The ALJ referenced Mr. Lester's psychological evaluation report findings.

Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7. In short, the ALJ's narrative of the record included the objective medical evidence, including imaging, and examination findings, as well as the other evidence of record, including but not limited to Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and her ultimate determination that Claimant remained capable of medium work during the relevant period despite his subjective complaints, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at [her] conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637. Accordingly, the undersigned **FINDS** the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant was not disabled from December 20, 2015 through the date of decision is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 13), **GRANT** the Defendant's request to affirm the decision below (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules

6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 23, 2021.



Omar J. Aboulhosn
United States Magistrate Judge